**United States District Court**
For the Northern District of California

1

2

3

4

5           UNITED STATES DISTRICT COURT

6           NORTHERN DISTRICT OF CALIFORNIA

7

8   AARON McCOY,                              No. C 09-4768 SI (pr)

9            Plaintiff,                       **ORDER OF SERVICE**

10       v.

11  MIKE EVANS, warden; et al.,

12           Defendants.
                                          /
13

14                          **INTRODUCTION**

15      Aaron McCoy, a California prisoner currently housed at Corcoran State Prison, filed this

16  pro se civil rights action under 42 U.S.C. § 1983, concerning events at Salinas Valley State

17  Prison where he previously was housed.  His complaint is now before the court for review under

18  28 U.S.C. § 1915A.

19

20                          **BACKGROUND**

21      In his complaint, Aaron McCoy alleges the following: On July 14, 2005, Salinas Valley

22  was placed on lock-down after an attack on correctional officers.  On October 17, 2005, facility

23  captain Ponder wrote a memo to all facility C staff and inmates explaining that the facility had

24  taken on a new mission, and that inmates from facility D would be moved to facility C.

25  Defendant Ponder drafted a CDC-128B "contract" that "basically was an agreement between

26  inmate and prison officials and staff that the signing inmate would obey all rules and regulations

27  and not participate in 'gang violence' and basically 'behave himself.'" Complaint, p. 6.  This

28  reiterated behavior that was already mandated by prison rules and regulations.

    On November 1, 2005, McCoy was interviewed.  He answered questions and agreed to

**United States District Court**
For the Northern District of California

1 behave himself, but he did not sign the CDC-128 contract.  McCoy states that after reading the

2 contract, he "was left confused and unsure if he would somehow forfeit his legal or ADA rights

3 by signing the document.  Therefore, plaintiff did not refuse to sign the contract but instead

4 wrote on the contract that he was CCCMS and would like to first speak to his clinician (mental

5 health staff) and <u>Coleman</u> attorneys before signing, which was 'reasonable accommodation.'" <u>Id.</u>

6 at 7.[1]

7      On November 4, 2005, McCoy received a memorandum from captain Ponder that stated

8 that McCoy "was now identified as failing to successfully complete the interview process and

9 was therefore deemed 'a potential threat to staff or inmates.'"  <u>Id.</u> at 8.  As a result, his canteen

10 purchases were limited, he could not receive quarterly food packages, and he was not eligible

11 for contact visits with his fiancée.  He also apparently was deprived of exercise for a lengthy

12 period of time.  <u>Id.</u> at 17.

13      On November 29, 2005, McCoy tried to explain to captain Ponder, via a correctional

14 officer, that he had mental health concerns that had not been taken into account in the CDC-128

15 contract.  Captain Ponder wasn't interested in his excuse/explanation.  Ponder said that McCoy

16 was on his "conspiracy list."  <u>Id.</u> at 12.

17      McCoy wrote to the Secretary of the California Department of Corrections and

18 Rehabilitation complaining about his problem.  As a result, another interview of McCoy was

19 conducted on January 30, 2006, but there was no clinician/staff assistant present.  At this point,

20 McCoy signed the CDC-128 contract, but above his signature "he wrote basically that as a

21 CCCMS inmate he in no way intended to give up any of his ADA rights or legal rights." <u>Id.</u> at

22 15. By this time, inmates who signed the contract without reservation were being allowed access

23 to outdoor exercise, canteen, contact visits, employment and (for CCCMS inmates) group

24 therapy.

25

26      [1]McCoy also states that he had a low reading score that "mandated" that he be provided
with a staff assistant under 15 Cal. Code Regs. § 3318.  That regulation provided him no rights
27 with regard to the contract because it only applies when the inmate is facing discipline on a
serious rule violation report, which plainly was not the case here. <u>See</u> 15 Cal. Code Regs. §
28 3315, 3318.

1    McCoy was informed he would be put in the behavior modification unit ("BMU"), a

2 highly restrictive environment for inmates who were deemed to be program failures. Among

3 other things, BMU inmates' property was sent home, and they had to attend a three-step program

4 to be released. The also apparently were denied exercise, and had to be in mechanical restraints

5 whenever they went anywhere, such as the law library. See 18.[2] These restrictions were ordered

6 by Ponder and warden Evans. McCoy was interviewed by a clinician because he had

7 complained to class counsel in the Coleman class action. While being interviewed by her,

8 correctional officers searched his cell and confiscated 50+ Seroquel tablets, which he referred

9 to as his "'suicide kit.'" Id. at 17.

10    On March 13, 2006, McCoy was told by sergeant Kircher that he and his brother (who

11 was in the same facility) were considered program failures by captain Ponder for challenging

12 the CDC-128 contract, that they would not be offered further opportunities to program, and that

13 they were scheduled to be placed in the BMU. Kircher wouldn't listen to McCoy's complaints

14 about the situation.

15    On March 15, 2006, C/O J. Rodriguez told McCoy to pack up because he was being sent

16 to BMU. McCoy expressed suicidal thoughts and was put on suicide watch in a filthy holding

17 cell but was not taken to the correctional treatment center. This upset him further, so he began

18 to hallucinate and started banging his head on the wall. C/O S. Harper activated his alarm for

19 staff assistance. McCoy was removed from the cell and examined by a medical staff member

20 who found a contusion and said that McCoy needed to go to the infirmary. C/O Singh and C/O

21 Darrett began escorting him roughly and, when he complained, C/O Lutes called them back.

22 They then put McCoy in tight and painful mechanical restraints and returned him to a holding

23 cell where he remained for about 7 hours. He complained to C/O Harper to no avail. At 11:00

24 p.m. C/O Sharps, Carlos and Troncoso escorted him to the correctional treatment center but

25 refused to give him his shoes. It was painful to walk over sharp rocks, stones and pebbles on the

26

27

28    [2]The complaint is somewhat unclear as to which restrictions resulted from the lock-down and which restrictions resulted from the BMU placement. The lack of clarity on this point does not affect whether the complaint states a claim upon which relief may be granted.

*United States District Court*
*For the Northern District of California*

3

**United States District Court**
For the Northern District of California

1    half mile walk to the correctional treatment center.

2    The next day, March 16, 2006, he was sent to the BMU, where his brother and about 20

3    other inmates were housed.  Their property had been confiscated, but it was returned the next

4    day.  He had a "short stay in the BMU" where he was verbally harassed by C/O Fassbender.  Id.

5    at 24.  He complained to Fassbender about, among other things, her treatment of McCoy's

6    brother.  Fassbender responded by transferring the brother to a separate section.  On March 21,

7    2006, McCoy complained to lieutenant Celaya about Fassbender – thinking that, since Celaya

8    was engaged to marry Fassbender, he would help stop her harassment.  Lt Celaya angrily

9    responded, "'you're going down!'" Id. at 25.  On March 22, 2006, defendant Fassbender falsified

10   a rule violation report for "disrespect with potential to violence."  On March 26, 2006, she

11   falsified another rule violation report for "sustained masturbation w/out exposure."  Id. at 25.

12   On March 27, 2006, he was sent to administrative segregation for the second rule violation

13   report.  The rule violation report was later reduced to "sexually based verbal epithets."  Id. at 26.

14   On March 28, 2006, he was interviewed by captain Ponder about the ad-seg placement.  Captain

15   Ponder admitted he was upset at the challenges to his programming, BMU, and CDC-128

16   contract.  He told McCoy that he and his brother "'won't have the last laugh.'" Id. at 27.   On

17   April 4, 2006, McCoy learned from C/O J. Rodriguez that he was accused of conspiring with his

18   brother.  Lt. Celaya ordered him placed in ad-seg again.  The alleged conspiracy was

19   investigated and found to be untrue.  On June 22, 2006, he received another CDC-114 ad-seg

20   placement notice so that prison staff could investigate alleged gang activity.  The matter was

21   investigated and McCoy was cleared of any wrongdoing.  On July 26, 2006, he received another

22   CDC-114 ad-seg placement notice, informing he would be retained in ad-seg pending transfer

23   to another institution.  He later learned that captain Ponder put a chrono[3] in his file that stated

24   that, after investigation, staff could not determine whether the information about the McCoy

25   brothers conspiring to assault staff or form a new prison gang was valid.  The chrono directed

26   that the two brothers were to be kept apart.  McCoy states that he and his brother never caused

27

28

[3]A "chrono" is prison parlance for a memorandum.

4

1   a single disturbance while on facility C and programmed positively until they asserted their

2   constitutional rights regarding the interview process.

3          McCoy also alleges that, on November 9, 2006, some inmates flooded the top tier and

4   staff refused to promptly clean it up.  He slipped and fell in a puddle the next day.  He injured

5   his back. Id. at 32-34.  The defendants for this claim – Winkfield, Carrasco and Delgado -- are

6   different from those for the other claims.

### DISCUSSION

8          A federal court must engage in a preliminary screening of any case in which a prisoner

9   seeks redress from a governmental entity or officer or employee of a governmental entity. See

10  28 U.S.C. § 1915A(a).  In its review the court must identify any cognizable claims, and dismiss

11  any claims which are frivolous, malicious, fail to state a claim upon which relief may be granted,

12  or seek monetary relief from a defendant who is immune from such relief.  See id. at

13  1915A(b)(1),(2). Pro se pleadings must be liberally construed. See Balistreri v. Pacifica Police

14  Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

15         To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements:  (1) that

16  a right secured by the Constitution or laws of the United States was violated and (2) that the

17  violation was committed by a person acting under the color of state law. See West v. Atkins,

18  487 U.S. 42, 48 (1988).

19         "Within the prison context, a viable claim of First Amendment retaliation entails five

20  basic elements:  (1) An assertion that a state actor took some adverse action against an inmate

21  (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

22  exercise of his First Amendment rights, and (5) the action did not reasonably advance a

23  legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005)

24  (footnote omitted).  Liberally construed, the complaint states a cognizable claim against

25  defendants Ponder, Evans, Kircher, Rodriguez, Harper, Singh, Darrett, Lutes, Sharps, Carlos,

26  Troncoso,  Fassbender, and Celaya for retaliation based on the adverse actions they allegedly

27  took as payback for McCoy voicing his objection that he needed to consult with his clinician/aid

28  before he signed the CDC-128 contract, and for writing a note of objection when he later signed

**United States District Court**
For the Northern District of California

1   the CDC-128 contract.  The complaint also states a cognizable claim against Celaya and

2   Fassbender for retaliation based on the adverse actions they allegedly took as payback for

3   McCoy complaining about Fassbender's harassment.[4]

4          The complaint does not state a claim for an ADA violation.  Although McCoy describes

5   it as a reasonable accommodation of his mental illness, what he wanted was legal advice as to

6   the CDC-128 contract.  See Complaint, p. 7.  McCoy allegedly wanted to talk to a clinician and

7   attorney before signing the CDC-128 contract to learn if he was forfeiting legal and ADA rights.

8   The duty to provide "reasonable accommodations" or "reasonable modifications" for disabled

9   people under Title II of the ADA arises only when a policy, practice or procedure discriminates

10  on the basis of disability.  See Weinreich v. Los Angeles County MTA, 114 F.3d 976, 979 (9th

11  Cir.) (no claim under ADA or Rehabilitation Act where disabled individual's exclusion from

12  transit program was based on his financial inability to provide updated information that he still

13  qualified for program, not on his disability), cert. denied, 522 U.S. 971 (1997).  The complaint

14  does not indicate that the CDC-128 contract, or the BMU program Ponder initiated discriminated

15  on the basis of a disability – indeed, McCoy alleges that everyone who did not sign the contract

16  faced the severe repercussions.  The CDC-128 contract itself said nothing about legal rights

17  being forfeited, and nothing about the forfeiture of ADA rights.  See Thomas, slip op. at 10293-

18  94.  The alleged failure to provide legal advice, or to allow an inmate to obtain legal advice, did

19  not amount to the denial of a reasonable accommodation.  The ADA claim is dismissed.  The

20  court notes, however, that the retaliation claim discussed above does involve the ADA indirectly,

21  as McCoy's complaint indicates he was retaliated against when he tried to protest the perceived

22  intrusion on his legal and ADA rights.

23         The complaint, liberally construed, states a cognizable due process claim against

24  defendants Ponder, Kircher, and Evans based on the absence of process before the BMU

25  placement.  The BMU allegedly involved severe restrictions on inmates' privileges and conduct.

26

27         [4]Fassbender's verbal harassment is not independently actionable, however.  See Keenan
    v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996), amended 135 F.3d 1318 (9th Cir. 1998)
28  (disrespectful and assaultive comments by prison guard not enough to implicate 8th
    Amendment).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Giving them the liberal construction to which they are entitled, the allegations of the complaint

2  appear to be sufficient to allege a deprivation of a liberty interest of real substance which

3  requires that due process be provided in connection therewith. See generally Toussaint v.

4  McCarthy, 801 F.2d 1080, 1100 (9th Cir. 1986), cert. denied, 481 U.S. 1069 (1987)(when prison

5  officials initially determine whether a prisoner is to be segregated for administrative reasons and

6  a liberty interest of real substance is implicated, due process requires that they hold an informal

7  nonadversary hearing within a reasonable time after the prisoner is segregated, inform the

8  prisoner of the charges against him or the reasons segregation is being considered, and allow the

9  prisoner to present his views); Superintendent v. Hill, 472 U.S. 445, 455 (1985) (due process

10  also requires that there be an evidentiary basis for the prison officials' decision to place an

11  inmate in ad-seg).

12      The complaint does not state a due process claim for the several trips to administrative

13  segregation because they each appear to have been too short in duration and because McCoy has

14  not alleged anything to suggest the conditions were any worse than in the BMU, where he was

15  located before his movement to ad-seg.

16      The complaint states a cognizable Eighth Amendment claim for the denial of exercise

17  during plaintiff's stay in the BMU and/or before he was released to general population.

18  See Thomas v. Ponder, No. 09-15522, slip op. 10285 (9th Cir. July 16, 2010).  Although the

19  complaint does not identify the exact number of weeks that McCoy was deprived of exercise,

20  he does suggest it was many weeks; defendants can learn the duration of the alleged deprivation

21  through discovery from plaintiff.  Liberally construed, the complaint appears to link defendants

22  Ponder, Evans, Kircher, Fassbender, and Celaya to this claim.

23      The complaint states a cognizable Eighth Amendment claim for deliberate indifference

24  to his medical needs for the handling of the suicide watch on March 15, 2006, and the failure to

25  take him to the infirmary after a member of the medical staff said he needed to go to the

26  infirmary.  The complaint states a claim against C/O Rodriguez, Harper, Singh, Darrett, and

27  Lutes for deliberate indifference to his medical needs.  Liberally construed, the complaint also

28  states a cognizable deliberate indifference claim against C/O Sharps, Carlos and Troncoso for

**United States District Court**
For the Northern District of California

1   requiring him to walk barefoot over sharp rocks, stones and pebbles for a half mile while in

2   mechanical restraints to get to the infirmary once he was finally allowed to go there.

3          Finally, the deliberate indifference to safety and medical needs claims regarding the slip

4   and fall on November 9, 2006 are dismissed because they are not properly joined with the other

5   claims.  The claim about the slippery floor and the problems with medical care after McCoy fell

6   in a puddle in ad-seg are not properly joined with the claims the court has found cognizable

7   because no "right to relief is asserted against them jointly, severally, or in the alternative with

8   respect to or arising out of the same transaction, occurrence, or series of transactions or

9   occurrences" and no "question of law or fact common to all defendants will arise in the action."

10  Fed. R. Civ. P. 20(a)(2).   These claims therefore are dismissed without prejudice to McCoy

11  filing another action in which he asserts those claims.  Defendants Winkfield, Carrasco and

12  Delgado are dismissed.

13

14                                    **CONCLUSION**

15       For the foregoing reasons,

16       1.       The second amended complaint states several claims for relief under 42 U.S.C. §

17  1983 for retaliation, a due process violation in connection with the placement in the BMU, an

18  Eighth Amendment violation based on the denial of exercise, and an Eighth Amendment claim

19  based on deliberate indifference to medical needs for the March 15, 2006 suicide watch incident.

20  The claim concerning the November 9, 2006 fall on the wet floor and medical needs thereafter

21  is dismissed as improperly joined.

22       2.       The clerk shall issue a summons and the United States Marshal shall serve, without

23  prepayment of fees, the summons, a copy of the second amended complaint and a copy of all the

24  documents in the case file upon the following persons, all of whom apparently work at Salinas

25  Valley State Prison, and all of whom (except for the warden) work on Facility C.

26       - warden Mike Evans
             - facility captain G. Ponder
27       - correctional sergeant Kircher
             - correctional officer S. Fassbender (possibly a/k/a S. Celaya)
28       - correctional officer J. Celaya

**United States District Court**
For the Northern District of California

1    - correctional officer J. Rodriguez
- correctional officer S. Harper
2    - correctional sergeant Lutes
- correctional officer Darrett
3    - correctional officer Singh
- correctional officer C. R. Sharps
4    - correctional officer Carlos
- correctional officer Troncoso
5
6    3.    In order to expedite the resolution of this case, the following briefing schedule for

dispositive motions is set:
7
8    a.    No later than **October 22, 2010**, defendants must file and serve a motion

for summary judgment or other dispositive motion. If defendants are of the opinion that this case
9
cannot be resolved by such a motion, they must so inform the court prior to the date the motion
10
is due.
11
b.    Plaintiff's opposition to the summary judgment or other dispositive motion
12
must be filed with the court and served upon defendant no later than **November 26, 2010**.
13
Plaintiff must bear in mind the following notice and warning regarding summary judgment as
14
he prepares his opposition to any summary judgment motion:
15
16    The defendants may make a motion for summary judgment by which they seek to
have your case dismissed. A motion for summary judgment under Rule 56 of the
17    Federal Rules of Civil Procedure will, if granted, end your case. [¶] Rule 56 tells
you what you must do in order to oppose a motion for summary judgment.
18    Generally, summary judgment must be granted when there is no genuine issue of
material fact -- that is, if there is no real dispute about any fact that would affect
the result of your case, the party who asked for summary judgment is entitled to
19    judgment as a matter of law, which will end your case. When a party you are
suing makes a motion for summary judgment that is properly supported by
20    declarations (or other sworn testimony), you cannot simply rely on what your
complaint says. Instead, you must set out specific facts in declarations,
21    depositions, answers to interrogatories, or authenticated documents, as provided
in Rule 56(e), that contradict the facts shown in the defendants' declarations and
22    documents and show that there is a genuine issue of material fact for trial. If you
do not submit your own evidence in opposition, summary judgment, if
23    appropriate, may be entered against you. If summary judgment is granted, your
case will be dismissed and there will be no trial. (See Rand v. Rowland, 154 F.3d
24    952, 962-63 (9th Cir. 1998).
25    Plaintiff also should take note that a defendant may file a motion to dismiss for failure to exhaust
26    administrative remedies instead of, or in addition to, a motion for summary judgment. A motion
27    to dismiss for failure to exhaust administrative remedies under 42 U.S.C. § 1997e(a) will, if
28    granted, result in the termination of the action. The plaintiff must "develop a record" and present

9

**United States District Court**
For the Northern District of California

1    it in his opposition to dispute any "factual record" presented by a defendant's motion to dismiss.

2    Wyatt v. Terhune, 315 F.3d 1108, 1120 n.14 (9th Cir. 2003).

3             c.    If defendant wishes to file a reply brief, the reply brief must be filed and

4    served no later than **December 17, 2010**.

5            4.    All communications by plaintiff with the court must be served on a defendant's

6    counsel by mailing a true copy of the document to defendant's counsel.  The court may disregard

7    any document which a party files but fails to send a copy of to his opponent.  Until a defendant's

8    counsel has been designated, plaintiff may mail a true copy of the document directly to

9    defendant, but once a defendant is represented by counsel, all documents must be mailed to

10   counsel rather than directly to that defendant.

11           5.    Discovery may be taken in accordance with the Federal Rules of Civil Procedure.

12   No further court order under Federal Rule of Civil Procedure 30(a)(2) or Local Rule 16 is

13   required before the parties may conduct discovery.

14           6.    Plaintiff is responsible for prosecuting this case.  Plaintiff must promptly keep the

15   court informed of any change of address and must comply with the court's orders in a timely

16   fashion.  Failure to do so may result in the dismissal of this action for failure to prosecute

17   pursuant to Federal Rule of Civil Procedure 41(b).  Plaintiff must file a notice of change of

18   address in every pending case every time he is moved to a new facility.

19           7.    Plaintiff is cautioned that he must include the case name and case number for this

20   case on any document he submits to this court for consideration in this case.

21           8.    Plaintiff's motion for referral to pro se prisoner settlement program is DENIED as

22   premature. (Docket # 3.)  The court will not consider referring a case to that program until the

23   defendants have been served with process, and that has not yet occurred.

24           9.    Plaintiff's request for the status of this case is GRANTED.  (Docket # 5.)  This

25   order does the initial screening and now some of the defendants will be served with process.

26         IT IS SO ORDERED.

27   Dated: July 26, 2010    _____

                                    SUSAN ILLSTON

28                              United States District Judge