**United States District Court**
For the Northern District of California

1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7                  NORTHERN DISTRICT OF CALIFORNIA
8
9   AARON McCOY,                          No. C 09-4768 SI (pr)
10          Plaintiff,                    **ORDER GRANTING MOTION TO**
                                          **DISMISS IN PART**
11      v.
12   MIKE EVANS, warden; et al.,
13          Defendants.
14   _____/
15
16                         **INTRODUCTION**
17          Aaron McCoy, a California prisoner currently housed at Corcoran State Prison, filed this
18   *pro se* civil rights action under 42 U.S.C. § 1983, concerning events at Salinas Valley State
19   Prison where he previously was housed.  Defendants now move to dismiss on the grounds that
20   (a) the due process claim is barred by res judicata and collateral estoppel, (b) plaintiff did not
21   exhaust his administrative remedies before filing this action, and (c) the complaint fails to state
22   a claim upon which relief may be granted.  For the reasons explained below, the court will grant
23   the motion in part, and dismiss the due process claim as barred by res judicata and because
24   administrative remedies were not exhausted for it.  The court also will dismiss at plaintiff's
25   request defendants Kircher, Carlos, Troncoso, Lutes and Rodriguez.
26
27
28

**BACKGROUND**

A.    <u>Allegations Of The Complaint</u>

In his complaint, Aaron McCoy alleged the following:

On July 14, 2005, Salinas Valley was placed on lock-down after an attack on correctional officers.  On October 17, 2005, facility captain Ponder wrote a memo to all facility C staff and inmates explaining that the facility had taken on a new mission, and that inmates from facility D would be moved to facility C.  Defendant Ponder drafted a CDC-128B "contract" that "basically was an agreement between inmate and prison officials and staff that the signing inmate would obey all rules and regulations and not participate in 'gang violence' and basically 'behave himself.'" Complaint, p. 6.  This reiterated behavior that was already mandated by prison rules and regulations.

On November 1, 2005, McCoy was interviewed.  He answered questions and agreed to behave himself, but he did not sign the CDC-128 contract.  McCoy states that after reading the contract, he "was left confused and unsure if he would somehow forfeit his legal or ADA rights by signing this document.  Therefore, plaintiff did not refuse to sign the contract but instead wrote on the contract that he was CCCMS and would like to first speak to his clinician (mental health staff) and *Coleman* attorneys before signing, which was a 'reasonable accommodation.'" *Id.* at 7.[1]

On November 4, 2005, McCoy received a memorandum from captain Ponder that stated that McCoy "was now identified as failing to successfully complete the interview process and was therefore deemed 'a potential threat to staff or inmates.'"  *Id.* at 8.  As a result, his canteen purchases were limited, he could not receive quarterly food packages, and he was not eligible for contact visits with his fiancée.  He also apparently was deprived of exercise for a lengthy period of time.  *Id.* at 17.

---

[1]McCoy also alleged that he had a low reading score that "mandated" that he be provided with a staff assistant under 15 Cal. Code Regs. § 3318.  That regulation, however, provided him no rights with regard to the contract because it only applied when the inmate faced discipline on a serious rule violation report, which plainly was not the case here.  *See id.*; *see also* 15 Cal. Code Regs. § 3315.

On November 29, 2005, McCoy tried to explain to captain Ponder, via a correctional officer, that he had mental health concerns that had not been taken into account in the CDC-128 contract.  Captain Ponder wasn't interested in his excuse/explanation.  Ponder said that McCoy was on his "conspiracy list."  *Id.* at 12.

McCoy wrote to the Secretary of the California Department of Corrections and Rehabilitation complaining about his problem.  As a result, another interview of McCoy was conducted on January 30, 2006, but there was no clinician/staff assistant present.  At this point, McCoy signed the CDC-128 contract, but above his signature "he wrote basically that as a CCCMS inmate he in no way intended to give up any of his ADA rights or legal rights."  *Id.* at 15.  By this time, inmates who signed the contract without reservation were being allowed access to outdoor exercise, canteen, contact visits, employment and (for CCCMS inmates) group therapy.

McCoy was informed he would be put in the behavior modification unit ("BMU"), a highly restrictive environment for inmates who were deemed to be program failures.  Among other things, BMU inmates' property was sent home, and they had to attend a three-step program to be released.  They also apparently were denied exercise, and had to be in mechanical restraints whenever they went anywhere, such as the law library.  *See id.* at 18.[2]  These restrictions were ordered by Ponder and warden Evans.  McCoy was interviewed by a clinician because he had complained to class counsel in the *Coleman* class action.  While being interviewed by her, correctional officers searched his cell and confiscated 50+ Seroquel tablets, which he referred to as his "'suicide kit.'"  *Id.* at 17.

On March 13, 2006, McCoy was told by sergeant Kircher that he and his brother (who was in the same facility) were considered program failures by captain Ponder for challenging the CDC-128 contract, that they would not be offered further opportunities to program, and that they were scheduled to be placed in the BMU.  Kircher wouldn't listen to McCoy's complaints

---

[2]The complaint is somewhat unclear as to which restrictions resulted from the lock-down and which restrictions resulted from the BMU placement.  The lack of clarity on this point does not affect whether the complaint states a claim upon which relief may be granted.

3

about the situation.

On March 15, 2006, C/O J. Rodriguez told McCoy to pack up because he was being sent to BMU.  McCoy expressed suicidal thoughts and was put on suicide watch in a filthy holding cell but was not taken to the correctional treatment center.  This upset him further, so he began to hallucinate and started banging his head on the wall.  C/O S. Harper activated his alarm for staff assistance.  McCoy was removed from the cell and examined by a medical staff member who found a contusion and said that McCoy needed to go to the infirmary.  C/Os Singh and Darrett began escorting him roughly and, when he complained, C/O Lutes called them back.  They then put McCoy in tight and painful mechanical restraints and returned him to a holding cell where he remained for about 7 hours.  He complained to C/O Harper to no avail.  At 11:00 p.m., C/O Sharps, Carlos and Troncoso escorted him to the correctional treatment center but refused to give him his shoes.  It was painful to walk over sharp rocks, stones and pebbles on the half mile walk to the correctional treatment center.

The next day, March 16, 2006, he was sent to the BMU, where his brother and about 20 other inmates were housed.  Their property had been confiscated, but it was returned the next day.  He had a "short stay in the BMU" where he was verbally harassed by C/O Fassbender.  *Id.* at 24.  He complained to Fassbender about, among other things, her treatment of McCoy's brother.  Fassbender responded by transferring the brother to a separate section.  On March 21, 2006, McCoy complained to lieutenant Celaya about Fassbender – thinking that, since Celaya was engaged to marry Fassbender, he would help stop her harassment.  Lt Celaya angrily responded, "'you're going down!'" *Id.* at 25.  On March 22, 2006, defendant Fassbender falsified a rule violation report for "disrespect with potential to violence."  On March 26, 2006, she falsified another rule violation report for "sustained masturbation w/out exposure." *Id.* at 25.  On March 27, 2006, he was sent to administrative segregation for the second rule violation report.  The rule violation report charge later was reduced to "sexually based verbal epithets." *Id.* at 26.  On March 28, 2006, he was interviewed by captain Ponder about the ad-seg placement.  Captain Ponder admitted he was upset at the challenges to his programming, BMU, and CDC-128 contract.  He told McCoy that he and his brother "'won't have the last laugh.'"

4

*Id.* at 27.   On April 4, 2006, McCoy learned from C/O J. Rodriguez that he was accused of conspiring with his brother.   Lt. Celaya ordered him placed in ad-seg again.   The alleged conspiracy was investigated and found to be untrue.   On June 22, 2006, he received another CDC-114 ad-seg placement notice that prison staff were investigating alleged gang activity.   The matter was investigated and McCoy was cleared of any wrongdoing.   On July 26, 2006, he received another CDC-114 ad-seg placement notice that he would be retained in ad-seg pending transfer to another institution.   He later learned that captain Ponder put a chrono (i.e., a memorandum) in his file that stated that, after investigation, staff could not determine whether the information about the McCoy brothers conspiring to assault staff or form a new prison gang was valid.   The chrono directed that the two brothers were to be kept apart.   McCoy alleged that he and his brother never caused a single disturbance while in facility C and programmed positively until they asserted their rights regarding the interview process.

B.    <u>The Initial Review Order</u>

The court conducted a preliminary screening of the complaint under 28 U.S.C. § 1915A, found several claims cognizable and dismissed several other claims.

First, the court found that the complaint stated a cognizable claim against defendants Ponder, Evans, Kircher, Rodriguez, Harper, Singh, Darrett, Lutes, Sharps, Carlos, Troncoso, Fassbender, and Celaya for retaliation based on the adverse actions they allegedly took as payback for McCoy voicing his objection that he needed to consult with his clinician/aide before he signed the CDC-128 contract, and for writing a note of objection when he later signed the CDC-128 contract.   The court also found that the complaint stated a cognizable claim against Celaya and Fassbender for retaliation based on the adverse actions they allegedly took as payback for McCoy complaining about Fassbender's harassment.

Second, the court found that the complaint stated a cognizable due process claim against defendants Ponder, Kircher, and Evans based on the absence of process before the BMU placement.   The BMU allegedly involved severe restrictions on inmates' privileges and conduct.

Third, the court found that the complaint stated a cognizable Eighth Amendment claim

against defendants Ponder, Evans, Kircher, Fassbender, and Celaya for the denial of exercise during McCoy's stay in the BMU and/or before he was released to general population.

Fourth, the court found that the complaint stated a cognizable Eighth Amendment claim against C/O Rodriguez, Harper, Singh, Darrett, and Lutes for deliberate indifference to McCoy's medical needs for the handling of the suicide watch on March 15, 2006, and the failure to take him to the infirmary after a member of the medical staff said he needed to go to the infirmary. The court also found that the complaint stated a cognizable Eighth Amendment deliberate indifference claim against C/O Sharps, Carlos and Troncoso for requiring McCoy to walk barefoot over sharp rocks, stones and pebbles for a half mile while in mechanical restraints to get to the infirmary once he was finally allowed to go there.

The court also dismissed several of McCoy's claims. The court found that the complaint did not state a claim for an ADA violation, or for a due process violation based on the several trips to administrative segregation. Finally, the court dismissed the claims against a different group of defendants regarding a slip and fall on November 9, 2006 as improperly joined.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss on the ground that there is a "failure to state a claim upon which relief may be granted." A motion to dismiss should be granted if plaintiff fails to proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (abrogating *Conley v. Gibson*, 355 U.S. 41 (1957)). The court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and must construe pro se pleadings liberally, *Hebbe v. Pliler*, 611 F.3d 1202, 1205 (9th Cir. 2010). The court need not accept as true allegations that are legal conclusions, unwarranted deductions of fact or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988, *amended*, 275 F.3d 1187 (9th Cir. 2001). In considering a motion to dismiss, the court may take judicial notice of matters of public record outside the pleadings. *See MGIC Indemn. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

**United States District Court**
For the Northern District of California

A Rule 12(b)(6) motion is not the right vehicle to challenge a prisoner's failure to exhaust administrative remedies.  Instead, non-exhaustion is a matter in abatement, which defendants may raise by way of an unenumerated Rule 12(b) motion.  *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003).  Defendants have the burden of raising and proving the absence of non-exhaustion in a Rule 12(b) motion.  *Id.*  "In deciding a motion to dismiss for a failure to exhaust nonjudicial remedies, the court may look beyond the pleadings and decide disputed issues of fact." *Id.* at 1119-20, citing *Ritza v. Int'l Longshoremen's & Warehousemen's Union*, 837 F.2d 365, 368 (9th Cir. 1988).  The court can decide factual issues in a jurisdictional or related type of motion because there is no right to a jury trial as to that portion of the case, unlike the merits of the case (where there is a right to a jury trial).  *See id.  Wyatt* and *Ritza* allow this court to resolve factual disputes, but only with regard to the exhaustion issue.

**DISCUSSION**

A.      The Due Process Claim is Barred By Res Judicata

In his federal civil rights complaint, McCoy contends that he was deprived of due process when he was subjected to sanctions after not signing the pledge to the satisfaction of prison officials.  The court found cognizable a due process claim based on the placement of McCoy in the BMU without any procedural protections being afforded to him before such placement. Defendants move to dismiss the due process claim on the ground that it is barred by the doctrines of res judicata and collateral estoppel because the same claims and issues were litigated in a prior state court action that was decided on the merits.

1.      State Court Habeas Petitions

Before he filed the federal civil rights complaint, McCoy had filed petitions for writ of habeas corpus in the Monterey County Superior Court and the California Court of Appeal.  Both courts denied his petitions.  Only the first state petition was litigated extensively, so only that one is described in depth.

McCoy filed a petition for writ of habeas corpus in the Monterey County Superior Court

7

that raised some of the same claims he asserts in this action.  Although apparently written in mid-March 2006, the petition in *In re. Aaron D. McCoy (D-61772)*, Monterey County Superior Court No. HC5353, was stamped "filed" on April 25, 2006.  RJFN #1, Ex. A at 10th page.[3]  The claims asserted in that petition included a claim that McCoy's right to due process was violated when he was subjected to various sanctions for failing to sign the pledge without qualification or objection.  He alleged that the "interview process being implemented . . . violates due process."  RFJN #1, Ex. A at 13th page.  The punishments allegedly imposed without due process included the BMU placement.  *See id.* at 16th, 24th and 26th pages.   In his prayer for relief, he requested a declaratory judgment that defendants' acts violated his "state constitutional rights and his rights as guaranteed by the United States Constitution." *Id.* at 26th page.  He also requested injunctive relief and "[s]uch other and further relief as the Court may deem just, proper and equitable." *Id.* at 26-27.

The Monterey County Superior Court rejected most of McCoy's claims (i.e., an ADA claim, an equal protection claim, an outdoor exercise claim, and an Eighth Amendment medical care claim) in its initial order.  RFJN # 2, Ex. A.  However, the court found that the petition appeared to state a prima facie case for relief as to his due process claim regarding the interview process and pledge.  *Id.* at 3.  The court directed respondent to file an informal response and a copy of a Department Operations Manual section regarding the confidential unlock procedure for in camera review by the court.  *Id.* at 5.  A briefing schedule was set for respondent's response and petitioner's reply.  *Id.*

Respondent filed a letter brief in which he argued that McCoy had not been denied due process and that the petition should be denied because McCoy had not exhausted administrative remedies before filing the action.  RFJN#2, Ex. D.  McCoy then filed a motion for preliminary injunction and/or temporary restraining order in which he contended that he had been sent to the newly created BMU on March 15, 2006 "without notice or hearing to justify such placement,

---

[3]Defendants filed two requests for judicial notice.  The request for judicial notice (docket # 20) filed with the motion to dismiss is referred to as RFJN #1.  The request for judicial notice (docket # 44) filed with the reply is referred to as RFJN # 2.

nor was he given an opportunity to formally challenge such placement before or during such placement," and had been put in administrative segregation less than two weeks later as a result of a CDC-115. RFJN #2, Ex. E at ¶. 2-3. McCoy also filed a reply to respondent's response to the order to show cause in which McCoy discussed the sanctions (including the BMU placement) imposed for not interviewing and signing the pledge to prison officials' satisfaction. RFJN #2, Ex. F at ¶. 9, 12, 16.

The Monterey County Superior Court later denied McCoy's petition. RFJN #1, Ex. B. In its order, the court described petitioner's due process claim, noted that it had reviewed the provisions of the Department Operations Manual, and rejected McCoy's due process claim.

McCoy also filed a petition for writ of habeas corpus in the California Court of Appeal. RFJN #2, Ex. G. His argument in that petition included an argument that the Monterey County Superior Court had erred in rejecting his habeas petition. The petition was denied by the California Court of Appeal in late 2006.

2.    Res Judicata Bars The Due Process Claim

The related doctrines of res judicata and collateral estoppel limit litigants' ability to relitigate matters. Under the doctrine of res judicata (also known as the claim preclusion doctrine), "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. . . . Under collateral estoppel [also known as the issue preclusion doctrine], once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Res judicata bars not only every claim that was raised in state court but also bars the assertion of every legal theory or ground for recovery that might have been raised in support of the granting of the desired relief. A plaintiff cannot avoid the bar of claim preclusion merely by alleging conduct by the defendant not alleged in the prior action, or by pleading a new legal theory. *See McClain v. Apodaca*, 793 F.2d 1031, 1034 (9th Cir. 1986); *see, e.g.*, *Stewart v. U.S. Bancorp*, 297 F.3d 953, 957-58 (9th Cir. 2002) (ERISA claim was barred where plaintiff's prior

action had been dismissed because his state law claim was preempted by ERISA and he had failed to amend the prior complaint to state a valid ERISA claim); *Smith v. City of Chicago*, 820 F.2d 916, 920 (7th Cir. 1987) (claim preclusion applied where single core of operative facts formed basis of both lawsuits and plaintiff neglected to raise § 1983 claim until years after it occurred and not until adverse judgment was rendered on cause of action for employment discrimination); *Fleming v. Travenol Laboratories, Inc.*, 707 F.2d 829, 834 (5th Cir. 1983) (claim preclusion applied where factual basis for Title VII claim was same as factual basis for § 1983 claim raised earlier; even though legal theory was different, same wrong was sought to be vindicated in each instance and plaintiff could have amended prior action to include Title VII claim).

The Federal Full Faith and Credit Statute, 28 U.S.C. § 1738, requires that a federal court give to a state court judgment the same preclusive effect as would be given that judgment under the law of the state in which the judgment was rendered.  *See Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984).  In California, a final judgment in state court "'precludes further proceedings if they are based on the same cause of action.'" *Brodheim v. Cry*, 584 F.3d 1262, 1268 (9th Cir. 2009) (quoting *Maldonado v. Harris*, 370 F.3d 945, 952 (9th Cir. 2004)). Under California's "primary rights theory," a "cause of action is (1) a primary right possessed by the plaintiff, (2) a corresponding primary duty devolving upon the defendant, and (3) a harm done by the defendant which consists in a breach of such primary right and duty.'" *Brodheim*, 584 F.3d at 1268 (citation omitted).  If this cause of action test is satisfied, then the same primary right is at stake, even if in the later suit the plaintiff pleads different theories of recovery, seeks different forms of relief, and/or adds new facts supporting recovery. *Id.*  "[B]ecause of the nature of a state habeas proceeding, a decision actually rendered should preclude an identical issue from being relitigated in a subsequent § 1983 action if the state habeas court afforded a full and fair opportunity for the issue to be heard and determined under federal standards." *Silverton v. Dept. of the Treasury*, 644 F.2d 1341, 1347 (9th Cir. 1981).

McCoy pursued the same cause of action in state court as here.  The primary right possessed by him was to remain free from a deprivation of a protected liberty interest without

procedural protections being afforded to him, the corresponding duty for prison officials was to not deprive him of a protected liberty interest without affording him established procedural protections, and the alleged harm was his retention in restrictive housing and the BMU with the denial of certain privileges for him.  The same procedural protection was complained of in both state and federal actions: failure to provide a staff assistant, and denial of notice and an opportunity to be heard.  The same injury was alleged in both: wrongful retention in restrictive housing and placement in the BMU.  The actions involve the same injury to the plaintiff and the same wrong by the same prison officials, even though the form of the action in state court (i.e., a habeas petition) led McCoy to identify as the adverse party his custodian rather than the individual wrongdoers.

The doctrine of res judicata does not apply "when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate the claim or issue. . . . 'Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation.'"  *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 480-81 & n.22 (1982) (citations omitted).  In enacting 28 U.S.C. § 1738 (i.e., the Federal Full Faith and Credit Statute), Congress intended that federal courts give preclusive effect to state court judgments whenever the courts of the State from which the judgment came would do so – accepting the rules chosen by the State from which the judgment came rather than employing their own rules of res judicata.  "The State must, however, satisfy the applicable requirements of the Due Process Clause.  A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to such a judgment."  *Kremer*, 456 U.S. at 482 (footnote omitted).  Where the federal court is considering the preclusive effect of a state court judgment under § 1738, "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law."  *Kremer*, 456 U.S. at 481.

McCoy had an opportunity for full and fair litigation of his claims that his right to due process was violated.  After he filed the petition in the Monterey County Superior Court, that

court ordered a response from respondent, the matter was briefed by respondent and McCoy, and evidence was submitted.   McCoy had an opportunity to, and did, dispute respondent's contentions.   He cited federal cases in his state petition and the reply brief.   The Monterey County Superior Court reviewed the evidence and argument, and concluded that there was not a due process violation.

The main difference between the state habeas proceeding and the present civil rights action is that damages are available in the civil rights action.   However, the unavailability of damages in the state habeas proceeding does not exempt that case from the reach of res judicata. *See City of Los Angeles v. Superior Court*, 85 Cal. App. 3d 143, 151 (Cal. Ct. App. 1978) (litigant "cannot avoid the impact of the rule against splitting causes of action by choosing for his first foray a tribunal of limited jurisdiction.")

"[A]ll claims based on the same cause of action must be decided in a single suit; if not brought initially, they may not be raised at a later date.  '"Res judicata precludes piecemeal litigation by splitting a single cause of action or relitigation of the same cause of action on a different legal theory or for different relief."' . . . A predictable doctrine of res judicata benefits both the parties and the courts because it 'seeks to curtail multiple litigation causing vexation and expense to the *parties* and wasted effort and expense in *judicial administration.*'" *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 897 (Cal. 2002) (citations omitted, emphasis in source).   In *Mycogen*, the court held that the plaintiff who prevailed in an action for declaratory relief and specific performance of a contract could not pursue damages in a subsequent action for breach of that same contract.   Res judicata barred the second action for damages.   *See id.* at 904; *accord Hatch v. Bank of America N.T. & S.A.*, 182 Cal. App. 2d 206, 210-11 (Cal. Ct. App. 1960) (prevailing plaintiff in quiet title action who received judgment determining his claim was superior and that he was entitled to immediate judgment was barred by res judicata from pursuing second action for damages sustained during time he was deprived of use of property).   Under California law, McCoy could not pursue an action for damages in California even if he had received a favorable adjudication in the habeas action.

McCoy's cause of action for a due process violation already has been litigated fully.  The

**United States District Court**
For the Northern District of California

1   fact that the earlier litigation was a state habeas proceeding does not exempt the case from the

2   principles of res judicata.  *See Silverton*, 644 F.2d at 1347.  Rather, the focus is whether McCoy

3   had a full and fair opportunity for the issue to be heard and litigated under federal standards,

4   *see id.*  He did.  Res judicata bars McCoy from relitigating the procedural due process claims

5   because the same cause of action is being pursued, McCoy is the same party as in the earlier

6   case, and the adjudication of the petition was final and on the merits.

7

8   B.      The Due Process Claim Also Must Be Dismissed For Non-Exhaustion

9           Defendants move under the unenumerated part of Rule 12(b) to dismiss the due process

10  claim on the ground that McCoy had not exhausted administrative remedies as to his due process

11  claim.  As mentioned in the "Legal Standards" section above, defendants have the burden of

12  raising and proving the absence of exhaustion, and the court can look beyond the pleadings to

13  decide disputed issues of fact as to the exhaustion question.  *See Wyatt*, 315 F.3d at 1119-20.

14          "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983],

15  or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility

16  until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The

17  State of California provides its inmates and parolees the right to appeal administratively "any

18  departmental decision, action, condition or policy perceived by those individuals as adversely

19  affecting their welfare."  *See* Cal. Code Regs. tit. 15, § 3084.1(a).  In order to exhaust available

20  administrative remedies within this system, a prisoner must proceed through several levels of

21  appeal: (1) informal resolution, (2) formal written appeal on a CDC 602 inmate appeal form, (3)

22  second level appeal to the institution head or designee, and (4) third level appeal to the Director

23  of the California Department of Corrections and Rehabilitation.  *See id.* § 3084.5; *Woodford v.*

24  *Ngo*, 548 U.S. 81, 85-86 (2006).

25          Exhaustion in prisoner cases covered by § 1997e(a) is mandatory.  *Porter v. Nussle*, 534

26  U.S. 516, 524 (2002).  All available remedies must be exhausted; those remedies "need not meet

27  federal standards, nor must they be 'plain, speedy, and effective.'"  *Id.* (citation omitted).  Even

28  when the prisoner seeks relief not available in grievance proceedings, notably money damages,

**United States District Court**
For the Northern District of California

exhaustion is a prerequisite to suit. *Id.*; *Booth v. Churner*, 532 U.S. 731, 741 (2001). The statute requires "proper exhaustion" of available administrative remedies. *See Woodford v. Ngo*, 548 U.S. at 93. In order to properly exhaust administrative remedies in California, a prisoner must "lodge his administrative complaint on CDC form 602 and '[] describe the problem and action requested.'" *Morton v. Hall*, 599 F.3d 942, 946 (9th Cir. 2010) (quoting Cal. Code Regs. tit. 15 § 3084.2(a)).

Defendants convincingly demonstrate that none of McCoy's inmate appeals that received a director's level decision raised the due process claim. McCoy did not exhaust the administrative remedies available to him for his due process claim.

McCoy suggests that two of his grievances should have put defendants on notice of his due process claims. The court disagrees. The description of the problem in inmate appeal SVSP-06-00976 concerned his placement on suicide watch; it did not mention that he did not receive procedural protections before being put in the BMU and did not mention the due process defendants. Foston Decl., Ex. F. The description of the problem in inmate appeal SVSP-06-03332 concerned the rule violation report he received for "sustained masturbation without exposure" and not his placement in the BMU without procedural protections. Foston Decl., Ex. H. The fact that McCoy said he was wrongly in the BMU – as when he argued that the rule violation report for masturbation never should have been written because he never should not have been in the BMU at all – would not have alerted the reader that what he was complaining about was a denial of procedural due process in his initial placement in the BMU. *See Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) ("'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought'"); *see, e.g., Morton*, 599 F.3d at 946 (grievance that complained of visitation restrictions, and did not mention an assault or theorize that the visitation restriction imposed was related to the assault, was insufficient to put prison officials on notice that staff conduct contributed to the assault); *O'Guinn v. Lovelock Correctional Center*, 502 F.3d 1056, 1062-63 (9th Cir. 2007) (grievance requesting a lower bunk due to poor balance resulting from a previous brain injury was not equivalent to, and therefore did not exhaust administrative remedies for, claims of denial of mental health treatment in violation of the ADA

United States District Court
For the Northern District of California

1   and Rehabilitation Act).  Neither of those two inmate appeals provided sufficient information

2   to alert prison officials to the contours of any due process claim so that they could "take

3   appropriate responsive measures."  *Griffin*, 557 F.3d at 1120.

4        McCoy also urges that letters and complaints written by him and third parties outside the

5   CDC-602 inmate appeal system satisfied the exhaustion requirement or excused the need to

6   exhaust.  He is incorrect.  The statute requires "proper exhaustion" of available administrative

7   remedies, *Woodford v. Ngo*, 548 U.S. at 93, and in California that means the prisoner must use

8   a CDC form 602 on which he describes the problem and action requested, *Morton*, 599 F.3d at

9   946, and pursue the matter through receipt of a decision at the director's level.

10       McCoy argues unpersuasively that he *did* submit an inmate appeal on March 14, 2006,

11  but that it "did not reach its destination and [his] subsequent inquiries were fruitless."

12  Opposition, p. 40.   In light of the numerous other inmate appeals that were processed and the

13  evidence of his vigorous pursuit of his claims, it is not credible that this one went missing when

14  there is no evidence other than McCoy's current say-so that it did.  McCoy presents no details

15  of what "inquiries" he made to find that missing appeal, offers no explanation as to why he did

16  not file a replacement inmate appeal, and presents no evidence contemporaneous with the events

17  in 2006 to show the submission of an appeal or inquiry about it.  The inmate appeals he filed

18  shortly thereafter made no mention of the allegedly unprocessed inmate appeal.  *See* Foston

19  Decl. Exs. F and G.

20       McCoy did not exhaust administrative remedies for the due process claim because he

21  never received a director's level decision on the claim, as required for exhaustion of

22  administrative remedies by a California prisoner.  Defendants have carried their burden to prove

23  non-exhaustion of the due process claim.

24       The determination that the due process claim must be dismissed because it is unexhausted

25  is an alternative holding because (as explained in the preceding section) the due process claim

26  must be dismissed because it is barred by res judicata.   As a practical matter, the determination

27  of non-exhaustion will matter only if the determination that the claim is barred by res judicata

28  is ever set aside (e.g., on appeal).   That is, if it is ever determined that the due process claim is

1

not barred by res judicata, the due process claim could not proceed because it is unexhausted.[4]

2

3    C.    Other Grounds Urged For Dismissal

4         Defendants urge that the complaint fails to state a claim upon which relief may be granted

5    with regard to the retaliation claim, part of the Eighth Amendment claim, and the claims against

6    defendant Evans.  This portion of their motion seeks to have the court revisit a decision already

7    made, as the court already had decided that the complaint <u>did</u> state a claim upon which relief

8    may be granted with regard to these claims and this defendant.  Several months ago, the court

9    did an initial screening of the complaint under 28 U.S.C. § 1915A, which requires the court to

10   dismiss, among other things, any claims that "fail to state a claim upon which relief may be

11   granted."  The court determined that the complaint did state cognizable retaliation claims,

12   *see* Order Of Service, ¶. 5-6; did state cognizable Eighth Amendment claims, *see id.* at 7-8; and

13   did state cognizable claims against defendant Evans for retaliation, a due process violation and

14   an Eighth Amendment violation, *see id.* at 5-7.

15        To seek reconsideration of an interlocutory order, such as the Order Of Service's

16   determinations that the complaint stated claims upon which relief may be granted, defendants

17   had to comply with Local Rule 7-9(a).  They did not.  They did not obtain leave of court to file

18   a motion for reconsideration, and made no argument in their brief that would suggest that they

19   could pass the test for such permission.  That is, they did not show: (1) that at the time of the

20   motion for leave, a material difference in fact or law exists from that which was presented to the

21   court before entry of the order for which the reconsideration is sought, and that in the exercise

22   of reasonable diligence the party applying for reconsideration did not know such fact or law at

23   the time of the order; or (2) the emergence of new material facts or a change of law occurring

24

_____

25        [4]A dismissal with prejudice is necessary due to the res judicata problem.  If the only
     problem was non-exhaustion of administrative remedies, the dismissal of the due process claim
26   would be without prejudice to McCoy filing a new action raising such a claim after he exhausts
     administrative remedies for it.  *See Jones v. Bock*, 549 U.S. 199, 222-24 (2007) (rejecting "total
27   exhaustion-dismissal" rule).  There is no point in leading this plaintiff to believe that he may file
     a new action after he exhausts administrative remedies because that is not the case here:
28   regardless of whether he exhausts, he still would have the problem that his due process claim is
     barred by res judicata.

United States District Court
For the Northern District of California

after the time of such order; or (3) a manifest failure by the court to consider material facts which were presented to the court before such interlocutory order.  *See* N. D. Cal. Civil L.R. 7-9(b). Even without the special requirements for motions to reconsider, defendants have the problem that a pleading challenge following a § 1915A screening of a prisoner complaint rarely will be successful, especially in light of the requirement that *pro se* complaints be liberally construed. *See Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (even after Supreme Court cases heightened the standards for pleading, the court's obligation "remains, 'where the petitioner is *pro se*, particularly in civil rights cases, to construe the pleadings liberally and to afford the petitioner the benefit of any doubt.'")

Defendants' motion to dismiss also reflects a basic misunderstanding of the rules at the pleading stage, as they attempt to have the court consider evidence that they submitted in opposition to the complaint.  In a Rule 12(b)(6) motion, defendants should confine themselves to the allegations in the complaint, the attachments to the complaint and matters judicially noticeable. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001) (while evidence outside the complaint called into question the correctness of plaintiff's allegations in the complaint, that evidence should not be considered in ruling on a Rule 12(b)(6) motion).  Here, defendants sought to have the court consider a medical record (attached as an exhibit to the Foston declaration) to determine the existence and/or extent of plaintiff's injury for purposes of evaluating his Eighth Amendment claim.  Presentation of that evidence is fine at the summary judgment stage or at trial when the plaintiff is required to *prove* his claims, but misplaced when the question is whether the plaintiff has adequately *pled* his claims.

Although the Rule 12(b)(6) motion to dismiss (as to the retaliation claim, part of the Eighth Amendment claims and the claims against defendant Evans) improperly requests reconsideration of an earlier order, the court also finds none of the arguments therein persuasive on the merits.

*Retaliation Claims*:  Defendants first argue that a retaliation claim is not stated because plaintiff was not exercising his First Amendment rights but instead only trying to exercise some perceived ADA right.  Their argument fails to persuade.  Plaintiff alleges that he was retaliated

**United States District Court**
For the Northern District of California

against for choosing to not sign the pledge form because he was concerned "he would somehow forfeit his legal or ADA rights by signing this document.  Therefore, plaintiff did not refuse to sign the contract but instead wrote on the contract that he was CCCMS and would like to first speak to his clinician (mental health staff) and Coleman attorneys before signing, which was a 'reasonable accommodation."  Complaint, p. 7.  The complaint also alleges that he had "a constitutional right under the First Amendment to not even participate in the interview process." *Id.* at 9.  The complaint also alleges that later, on January 30, 2006, he wrote a message of disagreement or qualification above his signature on the pledge form.  *Id.* at 15.  The complaint further alleges that the refusal to sign and then the qualified signature prompted the retaliation against plaintiff.    Liberally construed, the allegations are sufficient to plead that First Amendment protected activity prompted the allegedly retaliatory response.

Defendants next argue that the complaint does not allege any adverse action by defendant Celaya against plaintiff.[5]  They are wrong.  The complaint alleges that, when plaintiff asked Celaya to talk to Fassbender to "get her to cease from her disrespectful conduct and from harassing plaintiff and other such inmates, Lt. Celeya (sic) angrily responded, 'You're going down!'" *Id.* at 25.  The complaint further alleges that, the next day and again four days later, Fassbender (who was engaged to Celaya) issued false rule violation reports against McCoy. *Id.* at 25-26.  Also, the complaint alleges that Celaya ordered McCoy's placement in ad seg on another occasion based on a false accusation of conspiracy.  *Id.* at 27.  Liberally construed, these allegations are sufficient to plead adverse action by Celaya against McCoy necessary for the retaliation claim.

Defendants further argue that the complaint's allegation do not support a claim that the actions of Sing and Darrett were motivated by McCoy's refusal to sign the pledge.  The court disagrees.  The complaint alleges that the actions of Darrett and Singh were done "in retaliation and in support of defendants Ponder and Evans.  The defendants here were well aware of how

---

[5]Defendants assert that there are deficiencies in the retaliation and Eighth Amendment claims as to certain other defendants, but the court need not consider the adequacy of the pleading as to those defendants who plaintiff voluntarily dismissed.  The voluntary dismissal is discussed in Section "D" later in this order.

**United States District Court**
For the Northern District of California

their captain felt about plaintiff." *Id.* at 39.  That allegation follows a lengthy narrative about Ponder's alleged irritation at McCoy for not signing the pledge.  Liberally construed, the allegations of the complaint state a retaliation claim against defendants Singh and Darrett.

Defendants' argument that there was a legitimate penological purpose for defendant Ponder's actions is rejected because it relies on evidence outside the complaint.  The Rule 12(b)(6) motion tests the adequacy of the pleading, not the proof.

*Eighth Amendment Claim*:  Defendants argue that allegations regarding the handling of the March 15, 2006 suicide watch do not show an objectively serious medical need.  The court disagrees.  The complaint alleges that McCoy was having a mental health crisis with suicidal thoughts for which he was put in a filthy cell where he "began to hallucinate," and "became very paranoid and overwhelmed by the voices he was hearing so he began to bang his head on the wall until bloody."  Complaint, ¶. 20-21.  Those allegations sufficiently plead a serious medical need.  *See Hudson v. McMillian*, 503 U.S. 1, 16 (1992) (Blackmun, J., concurring) (Eighth Amendment prohibition against the unnecessary and wanton infliction of pain surely includes a notion of psychological harm; no Court precedent exists to the effect that psychological pain is not cognizable for constitutional purposes).  Defendants' argument that the medical records undermine plaintiff's allegations is irrelevant for purposes of ruling on the Rule 12(b)(6) motion.

Defendants also argue that deliberate indifference is not alleged for defendant Harper. The complaint alleges that, after McCoy banged his head during his mental health crisis, correctional staff then declined to take him to the infirmary for medical attention as recommended by a medical staff member and instead put him in tight and painful restraints making it difficult to breath.  Complaint, ¶. 21-22.  "Plaintiff remained in constant agony and often complained to C/O Harper to no avail."  *Id.* at 22.  This easily suffices to plead deliberate indifference by Harper.

*Defendant Evans*:  Defendants argue that the claims against defendant Evans must be dismissed.  They correctly note that § 1983 liability may not be premised on a respondeat superior theory, *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), but incorrectly argue that Evans' liability rests on such a theory.  The complaint alleges that Evans was a direct

participant in the deprivations of McCoy's constitutional rights.  The complaint describes the conditions of the BMU and then alleges – apparently with reference to the BMU – that "[t]his 'experiment ' was ordered by defendants Ponder and Evans."  *See* Complaint, pp. 16-18.  The complaint also alleges that "Evans and Ponder's actions and/or inactions herein resulted in plaintiff being sent to BMU . . . in violation of plaintiff's First, Eighth and Fourteenth Amendment rights under the U.S. Constitution."  Complaint, p. 38.  The complaint further alleges that "Evans and Ponder['s] actions and/or inactions created, enabled and maintained a culture of reprisals, hostility and retaliation among Fac. C staff towards inmates who had not completed the interview process to officials' satisfaction in violation of plaintiff's First, Eighth and Fourteenth Amendment rights under the U.S. Constitution."  Complaint, p. 38.  Liberally construed, these allegations are sufficient to state § 1983 claims against Evans for retaliation and an Eighth Amendment denial of exercise claim.[6]

D.      Voluntary Dismissal Of Several Defendants

    In his opposition, McCoy voluntarily dismissed defendants Kircher, Carlos, Troncoso, Lutes, and Rodriguez. Opposition, p. 62.  These defendants are now dismissed from this action.

**CONCLUSION**

    Defendants' motion to dismiss is GRANTED in part and DENIED in part.  (Docket # 18.) The due process claims are dismissed with prejudice because they are barred by res judicata. Defendants Kircher, Carlos, Troncoso, Lutes, and Rodriguez are dismissed. In all other respects, the motion to dismiss is DENIED.   The denial of the motion to dismiss says nothing about the merits of plaintiff's claims and only concerns the sufficiency of the pleading.

---

[6]McCoy urges in his opposition that Evans' liability is premised in part on Evans' failure to ameliorate the harsh conditions of the BMU when contacted by McCoy and McCoy's then-girlfriend. *See* Opposition, p. 56.  The more general allegations of the complaint are sufficient to encompass these specific acts.  Defendants may conduct discovery if they want an itemized list of Evans' alleged misdeeds.

The court now sets the following new briefing schedule for dispositive motions on the remaining claims:

1.      Defendants must file and serve their dispositive motion no later than **November 4, 2011**.

2.      Plaintiff must file and serve on defense counsel his opposition to the dispositive motion no later than **December 2, 2011**.

3.      Defendants must file and serve their reply brief (if any) no later than **December 19, 2011**.

The parties are cautioned that all future filings must comply with the local rule's page length limits, i.e., 25 pages for motions, 25 pages for oppositions, and 15 pages for reply briefs. See N. D. Cal. Local Rules 7-2 to 7-4.  A declaration is not subject to page limitations, but must contain only facts of which the declarant has personal knowledge; legal argument and case citations are improper in a declaration.

IT IS SO ORDERED.

Dated: September 1, 2011

_____
SUSAN ILLSTON
United States District Judge

21